UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
HALL HOMES REALTY, INC.,

        Plaintiff,                     MEMORANDUM
                                             AND ORDER
  -against-                               10 CV 657 (ERK)(RML)

REPUBLIC OF SENEGAL,

        Defendant.
-------------------------------------------------------------X

LEVY, United States Magistrate Judge:

        Plaintiff Hall Homes Realty, Inc. ("plaintiff" or "Hall Homes") and defendant Republic of Senegal ("defendant" or "Senegal") each move for summary judgment under Fed. R. Civ. P. 56. The cross-motions are before me on consent of the parties pursuant to 28 U.S.C. § 636. I heard oral argument on October 18, 2011. (See Transcript of Oral Argument, dated Oct. 18, 2011 ("Tr.").) For the reasons stated below, defendant's motion is granted and plaintiff's is denied.

## BACKGROUND AND FACTS

        Plaintiff commenced this breach of contract[1] action against Senegal and Hotel E. 44th LLC[2] ("Hotel") in New York Supreme Court, Richmond County, in January 2010. On February 16, 2010, Senegal removed the action to this court. The action arises out of Senegal's

---

[1] Plaintiff initially also asserted commercial bad faith and fraud claims. However, it has subsequently withdrawn those claims. (See Plaintiff's Memorandum of Law in Opposition to Republic of Senegal's Motion to Dismiss, dated Apr. 19, 2010, at 2; see also Plaintiff's Memorandum in Opposition, dated June 29, 2011, at 7.)

[2] On April 1, 2010, Judge Korman ordered Hotel terminated as a defendant, pursuant to a stipulation of dismissal between plaintiff and Hotel. (Order Dismissing Parties, dated Apr. 1, 2010.)

November 2009 purchase of commercial real property located at 227-235 East 44th Street in New York, New York (the "Property") from Hotel. Plaintiff, a real estate agency, claims it acted as defendant's broker and helped to facilitate the purchase of the Property. (See generally Complaint, dated Jan. 6, 2010 ("Compl.").) Defendant denies that there was a contract between Senegal and plaintiff, but contends that even if there was such an agreement, it was contingent upon a condition that was never met. Both parties served and filed a Statement of Material Facts Not in Genuine Dispute, in compliance with Local Civil Rule 56.1(a).[3] The basic undisputed facts are as follows:

  Beginning in or around 2006, Pape M. Diedhiou ("Pape"), an authorized representative of Senegal, was tasked with locating and purchasing a commercial property in Manhattan for the future location of Senegal's Permanent Mission to the United Nations. (Defendant's Statement of Undisputed Facts, dated June 23, 2011 ("Def.'s Rule 56.1"), ¶ 1.) In or about November 2006, Senegal learned of a property located at 227-229 East 44th St; on November 3, 2006 it made a $17,000,000 offer for that property through an attorney, Gary Rosen. (Id. ¶ 2.) Plaintiff had no involvement in the offer, which was ultimately rejected. (Id. ¶ 5.)

  Shortly after defendant made its offer to purchase 227-229 East 44th St, it began working with Mamadou L. Diedhiou ("Mamadou"), Pape's distant cousin, to locate a property

---

[3] Under Local Civil Rule 56(c), all material facts set forth in the statement required to be served by the moving party "will be deemed to be admitted for the purposes of the motion unless specifically controverted . . . in the statement required to be served by the opposing party." Local Civil Rule 56(c); see also T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 417–18 (2d Cir. 2009).

for the Mission. (Id. ¶ 7.) In 2007, Mamadou began working for Hall Homes and brought Senegal in as a client. (Id. ¶ 8.) In November 2007, Mamadou provided Pape with a "Dual Agency with Designated Sales Associates" disclosure form dated November 3, 2007. (Id. ¶ 13.) On or around November 13, 2007, Hall Homes, on behalf of Senegal, made an offer to purchase a property located on East 50th St. (Id. ¶ 12.) The deal was not consummated. (Id. ¶ 15.)

At some point in early 2008, the parties learned that Hotel, the owner of 227-229 East 44th St., had acquired 235 E 44th St., the adjoining parcel.[4] In May 2008, Pape and Daniel Hall ("Hall"), plaintiff's principal, exchanged a series of emails regarding the Property. (See id. ¶¶ 19–21.) On May 29, 2008, Pape and Mamadou signed a Brokerage Agreement[5] (the "May 29 Brokerage Agreement") that related to the possible purchase of the Property for $24 million.[6] (See Brokerage Agreement, dated May 29, 2008, annexed as Exs. 9 & 10 to the Declaration of Pape M. Diedhiou, dated June 13, 2011 ("Pape Decl.").)

---

[4] The parties dispute when and how Senegal learned of the acquisition.

[5] The May 29 Brokerage Agreement states that "the broker herein is entitled to a commission in the amount of 3% of the selling price . . . ." (Declaration of Daniel Hall, dated May 3, 2011 ("Hall Decl."), Exs. 9, 10.) It also provides that the "commission shall be payable . . . pursuant to a contract between the purchaser and the seller dated TBA." (Id., Exs. 9, 10.) Finally, the May 29 Brokerage Agreement states that "[s]hould the deed not be delivered pursuant to said contract, for any reason whatsoever, except for Willful Default of the seller, there shall be no commission due on the basis of the aforementioned services rendered." (Id., Exs. 9, 10.)

[6] It bears noting that the record contains two copies of the May 29 Brokerage Agreement. (See Pape Decl., Exs. 9, 10.) There are a few material differences between the two documents. The first document, which is presumably a draft, is signed only by Pape (and not by Mamadou), whereas the second is signed by both parties. (Compare Pape Decl., Ex. 9 with Pape Decl., Ex. 10.) In addition, in the first document, "SELLER" is written next to Pape's name (and nothing next to Mamadou's); in the second document, "Buyer" is written next to Pape's name and "Selling Agent & Selling Broker" next to Mamadou's. (Compare Pape Decl., Ex. 9 with Pape Decl., Ex. 10.)

Sometime in late May or early June 2008, Pape authorized plaintiff to convey a $24 million offer to Hotel for the Property, verbally and in writing. (Plaintiff's Statement of Undisputed Facts, dated June 29, 2011 ("Pl.'s Rule 56.1"), ¶ 19.) Hotel rejected this initial offer. (Deposition of Daniel Hall, dated Mar. 23, 2011 ("Hall Dep."), annexed as Ex. C. to the Declaration of Richard A. Rosenzweig, Esq., dated May 3, 2011 ("Rosenzweig Decl."), at 28.) On June 22, 2008, Hall Homes prepared a second brokerage agreement in connection with the Property (the "June 22 Brokerage Agreement"). (Def.'s Rule 56.1 ¶ 33.) The June 22 Brokerage Agreement, which sets the broker's fee at three percent of the selling price "TBA," lists Hall Homes as the "Broker" and "Arjuna Sunderam" as "the Seller."[7] (See Pape Decl., Exs. 12, 13.) However, it is signed by Pape rather than Sunderam, who was Hotel's agent. (See id., Exs. 12, 13.) It is also signed by Hall. (See id., Exs. 12, 13.) At the time that Hall Homes prepared and signed the June 22 Brokerage Agreement, it understood that Senegal was entering into a contract with Hotel for the acquisition of the Property. (Def.'s Rule 56.1 ¶ 37.)

Pursuant to a purchase and sale agreement dated June 26, 2008 (the "2008 PSA"), Senegal and Hotel entered into an agreement for the sale of the Property. (Id. ¶ 38.) On August 26, 2008, Hotel terminated its contract with Senegal due to Senegal's failure to pay the purchase price balance by the closing date. (See Pape Decl., Ex. 17.) After Hotel terminated the 2008 PSA, Hall Homes had "only 'limited' verbal communications with Pape in September and October of 2008 and no further written communications." (Def.'s Rule 56.1 ¶ 55.) Senegal

---

[7] As was the case with the May 29 Brokerage Agreement, there are two separate versions of the June 22 agreement in the record. (See Pape Decl., Exs. 12 & 13.) The only difference between the two is that the first states "Seller Signature" under Pape's name and the second has "Buyer Signature" under it. (Compare Pape Decl., Ex. 12 with Pape Decl, Ex. 13.)

eventually acquired the Property pursuant to a sales and purchase agreement dated August 8, 2009 (the "2009 PSA") for $24,500,000. (Id. ¶ 57.)

The parties now cross-move for summary judgment. Plaintiff argues that it is entitled to summary judgment because the evidence shows it had a contract with defendant and it helped initiate the sale of the Property. On the other hand, defendant argues that it is entitled to summary judgment because the record demonstrates that Hotel (the seller), not Senegal (the buyer), was the only party that would have paid the commission had one been due to Hall Homes. Moreover, defendant argues that even assuming there was an agreement between plaintiff and defendant, that agreement conditioned any payment to Hall Homes upon the closing of the 2008 PSA, which did not occur.

## DISCUSSION

A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The function of the district court in considering the motion for summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried." Eastman Mach. Co. v. United States, 841 F.2d 469, 473 (2d Cir. 1988) (citations omitted). It is well-settled that "[o]n a motion for summary judgment, the court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact, but only to determine whether there are issues to be tried." United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994) (citations omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, there is sufficient evidence favoring the

non-movant such that a reasonable jury could return a verdict in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The initial burden of establishing that no genuine factual dispute exists rests upon the party seeking summary judgment. Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994) (citation omitted). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). On the other hand, "the nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006) (citations omitted). An "opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." Contemporary Mission, Inc. v. U.S. Postal Serv., 648 F.2d 97, 107 n.14 (2d Cir. 1981) (citation omitted).

When the parties cross-move for summary judgment, "the standard is the same as that for individual motions for summary judgment." Natural Res. Def. Council v. Evans, 254 F. Supp. 2d 434, 438 (S.D.N.Y. 2003) (citations omitted). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." Id. (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)).

B. Defendant's Summary Judgment Motion

The court will turn first to defendant's summary judgment motion. Defendant argues that it does not owe plaintiff a commission because, even assuming that there was an

agreement between the parties for defendant to pay Hall Homes a commission,[8] that agreement was conditioned upon the acceptance of defendant's original May offer or the closing of the 2008 PSA, neither of which ever occurred.  Defendant relies on a provision in both the May 29 and June 22 Brokerage Agreements that states that "[s]hould the deed not be delivered pursuant to said contract, for any reason whatsoever, except for Willful Default of the seller, there should be no commission due . . . ."  (See Pape Decl., Exs. 9–12.)  According to defendant, the brokerage agreements evidence Hall Homes' intent to condition its entitlement to a commission on conditions precedent, namely the closing of the title pursuant to its original $24 million offer (the May 29 agreement) and the closing of the title pursuant to the 2008 PSA (the June 22 agreement).[9]  (See Tr. at 29–33; see also Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Cross-Motion for Summary Judgment Dismissing the Complaint, dated June 13, 2011 ("Def.'s Mem."), at 16–17.)

In opposition, plaintiff makes three arguments: (1) the term "said contract" was meant to refer to any future contract between defendant and the Seller; (2) Senegal willfully defaulted and cannot therefore enforce the conditional language; and (3) plaintiff is entitled to a commission regardless of the language of the 2008 Brokerage Agreements.  I will address each argument in turn.

---

[8] Defendant also argues that there are no questions of fact as to whether defendant agreed to pay a commission to plaintiff.

[9] In their written submissions and at times during oral argument, the parties did not distinguish between the May 29 and June 22 Brokerage Agreements.  However, as the court believes it is important to do so and the parties did so during the later parts of oral argument, the court will focus on the arguments that address each agreement separately.

1. The Meaning of "Said Contract"

First, plaintiff argues that "said contract" was intended to refer to *any* future contract, rather than (a) the contract that would result from defendant's initial $24 million dollar offer or (b) the 2008 PSA.  (See Plaintiff's Memorandum of Law in Opposition, dated June 29, 2011 ("Pl.'s Opp. Mem."), at 5 (the form brokerage agreements "deliberately contain[] no date of contract and thus [were] meant to refer to any future contract that transpired with regard to the property between those two parties" (citing Hall Dep. at 41)); see also Tr. at 13 ("[T]here's no specific date in there, and therefore, it's not limited to a specific contract.").)  In essence, plaintiff urges the court to look beyond the text of the Brokerage Agreements and to accept Daniel Hall's meaning of the provision.  The court declines to do so.

Under New York law, interpretation of a contract is a matter of law for the court to decide and the court must determine whether a contract is unambiguous with respect to the issue about which the parties disagree.  Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002) (citation omitted).  "Contract language is ambiguous if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'"  Am. Home Assur. Co. v. Hapag Lloyd Container Linie, GMBH, 446 F.3d 313, 316 (2d Cir. 2006) (citation omitted).  If the court determines that "the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms, and those terms may be the basis for summary judgment."  Dusé v. Int'l Bus. Machs. Corp., 252 F.3d 151, 158 (2d Cir. 2001) (internal quotation and citation omitted).

In this case, no ambiguity exists with respect to the meaning of "said contract." Any reasonable person would interpret that language as referring to a particular contract because the entire phrase would be rendered meaningless otherwise.[10] See Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y., 273 F. Supp. 2d 436, 445 (S.D.N.Y. 2003) ("It is axiomatic under New York law that courts interpret a contract so as to give effect to all of its provisions and 'cannot and should not accept an interpretation that ignores the interplay of the terms, renders certain terms 'inoperable,' and creates a conflict where one need not exist.'" (quoting Pearce, Urstadt, Mayer & Greer Realty Corp. v. Atrium Dev. Assocs., 571 N.E.2d 60, 64 (N.Y. 1991)). It is plain from the $24 million selling price on the May 29 Brokerage Agreement that "said contract" refers to the $24 million offer that Daniel Hall conveyed to Hotel on Senegal's behalf, and it is undisputed that at the time Hall Homes prepared and signed the June 22 Brokerage Agreement, it understood that Senegal was entering into a contract with Hotel for the acquisition of the Property. (Def.'s Rule 56.1 ¶ 37.) Thus, as defendant contends, the 2008 Brokerage Agreements conditioned payment upon the closing of either the original $24 million offer or the 2008 PSA.[11]

---

[10] As defendant argues, plaintiff "could have just said [']should the deed not be delivered for any reason whatsoever.[']" (Tr. at 29.) Moreover, despite plaintiff's contention (see id. at 15), the date of contract being listed as "TBA" does not alter the fact that for the provision at issue to be operable, it must refer to a particular contract. In fact, if anything, the date being "TBA"—which Hall testified meant "to be announced" (see Hall Dep. at 39)—lends support to the notion that when Hall Homes drafted the Brokerage Agreements, it was in the midst of negotiating the terms of particular offers and/or contracts.

[11] It should also be noted that even if there were an ambiguity as to the meaning of "said contract," the court would construe that ambiguity against plaintiff, as it drafted the contract. See Abernathy-Thomas Eng'g Co. v. Pall Corp., 103 F. Supp. 2d 582, 606 (E.D.N.Y. 2000) (citations omitted); Graff v. Billet, 477 N.E.2d 212, 902 (N.Y, 1985) ("If there is any doubt or uncertainty as to the meaning of the disputed language in the brokerage agreement, all ambiguity must be resolved against the broker who prepared it." (citations omitted)).

2. The Enforceability of the Condition

Plaintiff also argues that even if "said contract" refers only to the original $24 million offer and the 2008 PSA, Senegal cannot be granted summary judgment on the basis of that condition not being met because "the 2008 contract would have closed but for Senegal's willful failure to pay the purchase price balance by the closing date[,]" and since defendant prevented title from passing, it "cannot now claim failure to meet that condition." (Defendant's Memorandum in Opposition, dated June 29, 2011 ("Pl.'s Opp. Memo"), at 6 (citing Lane-Real Estate Dep't Store v. Lawlet Corp., 268 N.E.2d 635 (N.Y. 1971); Dagar Group Ltd. v. South Hills Mill, LLC, 786 N.Y.S.2d 72 (2d Dep't 2004); Lawrence v. Miller, 86 N.Y. 131 (1881)).)

The cases that plaintiff cites are not instructive on this particular question. First, they all involve commissions sought from the *seller* rather than the buyer. Second, the idea behind this line of cases, which is discussed in Levy v. Levy, 239 N.E.2d 378, 381 (N.Y. 1968), is that the seller should be deemed to have waived the condition of the contract through its own "active conduct . . . preventing or hindering the fulfillment of the condition." The court declines to extend the reasoning of Levy and other cases to a situation where the condition was not met because of a buyer's inability to pay. Inability to pay can hardly be characterized as willful conduct and, if anything, seems to constitute evidence that a broker did not in fact bring together a seller and a buyer who was ready, willing, and able to purchase the property.[12]

---

[12] At oral argument, plaintiff also argued that "it seems like willful default" because as part of the 2008 PSA, defendant warranted that it had the money to close but "then apparently they didn't close on the 2008 contract because they didn't have the money." (Tr. at 15.) However, plaintiff provides no support for the proposition that the inability of a purchaser to close when it earlier averred that it was financially capable of doing so constitutes a willful
(continued...)

### 3. Significance of 2008 Brokerage Agreements

Finally, plaintiff argues opaquely and without citing any authority that "[r]egardless of which contract the deal closed under, Plaintiff brought the buyer and seller together." (Pl.'s Opp. Mem. at 6 (citing Rosenzeig Decl., Ex. C at 42–43).) It is true that the general rule is that "all a broker need do to establish a prima facie case [for a real estate commission] is introduce evidence tending to show the existence of a commission agreement and that he has procured a ready, willing and able purchaser at the price and terms of the seller." Lane--Real Estate Dept. Store, 268 N.E.2d at 640. However, parties to a brokerage agreement may depart from this general rule and, by agreement, require the performance of an additional event. See id. at 639 ("For example, they can condition the seller's liability on the closing of title or require the broker to supply a buyer to purchase the property at a specified price 'with terms to be arranged.' In the former case the broker would not earn a commission if the deal were not consummated."). As discussed above, it is clear that the 2008 Brokerage Agreements included the performance of such events. As those events never occurred, plaintiff is not entitled to a commission regardless of whether it brought the parties together in any factual (or even legal) sense.

In sum, plaintiff has not raised any material questions of fact.[13] As a result,

---

[12](...continued)
default.

[13] Without reference to any case law, plaintiff also argues that defense counsel's submissions should be "rejected" because they lack authority to represent defendant in this case. (See Pl.'s Opp. Mem. at 2.) Not only does plaintiff mischaracterize the evidence upon which it relies (compare Pl.'s Opp. Mem. at 2 ("Pape . . . testified that no one within the government of Senegal was aware of the present lawsuit. Thus, no one with the authority to act on behalf of
(continued...)

plaintiff's motion for summary judgment is denied and defendant's summary judgment motion is granted.[14]

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted and plaintiff's is denied. The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

Dated: Brooklyn, New York
March 30, 2012

/s/
ROBERT M. LEVY
United States Magistrate Judge

---

[13](...continued)
Senegal could have retained Cozen O'Connor to represent Senegal.") with Pape Dep. at 36–37 (Pape stating that Paul Baji, Senegal's ambassador, was unaware that Senegal had been sued but making no statement about the knowledge of anyone else within the government)), but the request is also spurious for the reasons detailed in defendant's reply brief (see Reply in Support of Cross-Motion for Summary Judgment, dated Aug. 15, 2011, at 15).

[14] Because the court finds that defendant's motion should be granted, it is unnecessary to analyze plaintiff's summary judgment claim. It is also unnecessary to address defendant's motion to strike portions of the Declaration of Richard A. Rosenzweig, Esq.